# UNITED STATES DISTRICT COURT
## for the
### Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Apple, Inc., One Infinite Loop, Cupertino, California 95014
(619-273-6088; k3vinsanchez@gmail.com; k3vinsanchez@icloud.com; Alison Sanchez Briones)

Case No.  24-mj-04323-DDL

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the ___Northern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sec. 952, 960, 963 | Importation of a Controlled Substance and conspiracy |
| 21 USC Sec. 841, 846 | Possession of a controlled substance with intent to distribute and conspiracy |

The application is based on these facts:
See Attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Davis Johnstone*
Applicant's signature

HSI SA Davis Johnstone
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: November 15, 2024

*/s/ David Leshner*
Judge's signature

City and state: San Diego, California

Hon. David D. Leshner, U.S. Magistrate Judge
Printed name and title

# **ATTACHMENT A**

Apple Inc. is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records, and data located at One Infinite Loop, Cupertino, California, 95014.

# **ATTACHMENT B**

I.  Service of Warrant

The officer executing the warrant shall permit Apple Inc. (the ISP), as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

II. Items Subject to Seizure from the ISP

> A. All subscriber and/or user information, all electronic mail, files, cloud storage, location information, search history, images, text messages, voicemail, histories, buddy or friend lists, contacts, iCloud Drives, iCloud files, iCloud Backup and Restore, photos, notes, videos, calendars, messages profiles, methods of payment, detailed billing records, access logs, transactional data and any other files or records for:
>
> **619-273-6088**
> **k3vinsanchez@gmail.com**
> **k3vinsanchez@icloud.com**
> **Alison Sanchez Briones**

> B. The search of the data supplied by the ISPs pursuant to this warrant will be conducted by the Homeland Security Investigations as provided in the "Procedures For Electronically-Stored Information" section of the affidavit submitted in support of this search warrant and will be limited to evidence of violations of 21 U.S.C. Sections 952, 960, and 963 and 21 U.S.C. Sections 841 and 846 for the period of November 1, 2023, up to and including October 23, 2024, and to seizure of:
>
> > A. Communications, records, attachments, files, and data tending to discuss or suggest efforts to import cocaine or some other federally controlled substance from Mexico into the United States, or possess and/or transport with the intent to distribute federally controlled substances within the United States;
> >
> > B. Communications, records, attachments, files, and data tending to identify accounts, facilities, storage devices, and/or services–such as email addresses,

  IP addresses, and phone numbers–used to facilitate the importation of cocaine or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

C. Communications, records, attachments, files, and data tending to identify co-conspirators, criminal associates, or others involved in importation of cocaine or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

D. Communications, records, attachments, files, and data tending to identify travel to or presence at locations involved in the importation of cocaine or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substance within the United States, such as stash houses, load houses, or delivery points; and

E. Communications, records, attachments, files, and data tending to identify the user(s) of the subject accounts, and any co-conspirators involved in the activities in II(A)-(D) above;

F. Communications, records, attachments, files, and data that provide context to any communications or records described above, such as messages sent or received in temporal proximity to any relevant electronic communications and any electronic communications tending to identify users of the subject accounts;

**which are evidence of violations of Title 21 U.S.C. §§ 952, 960, and 963 and Title 21 U.S.C., §§ 841 and 846 (conspiracy to import and importation of controlled substances and possession of a controlled substance with intent to distribute and conspiracy).**

# AFFIDAVIT

I, Special Agent Davis Johnstone, being duly sworn, hereby state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I submit this affidavit in support of an application for a search warrant to under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Apple Inc. ("Apple") to disclose to the government records and other information, including the contents of communications, for the **Target Account** associated with identifiers: telephone number **619-273-6088**, email addresses **k3vinsanchez@gmail.com** and **k3vinsanchez@icloud.com**, and name **Alison Sanchez Briones**, that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B and relates to the investigation and prosecution of Alison Kevin SANCHEZ Briones ("Defendant") for importing about 59.60 kilograms (131.40 pounds) of cocaine from Mexico into the United States.

2. I have been employed as a Special Agent with Homeland Security Investigations (HSI) since August 2021. I am currently assigned to the HSI Office of the Deputy Special Agent in Charge, in San Ysidro, California. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.

3. During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry. Through my training and experience I have also gained a working knowledge of the operational habits of transportation and distribution methods used by narcotics traffickers once inside the United States.

4.     I am aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles or on persons entering the United States at Ports of Entry such as the San Ysidro Port of Entry, Otay Mesa Port of Entry, and Tecate Port of Entry. With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual responsible for importing the concealed narcotics into the United States. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the transporter(s) regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the transporter(s) to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the transporter(s) to provide further instructions regarding the delivery of the narcotics to a destination within the United States. And traffickers may continue to communicate with the transporter(s) to provide instructions regarding transportation of currency which is often exchanged for the narcotics.

5.     In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of drug trafficking organizations. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in the affidavit. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

6.     Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of violations of Title 21, United States Code, Sections 952, 960, and 963 and Title 21, United States Code,

Sections 841 and 846 as described in Attachment B.

## JURISDICTION

7. This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States ... that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## FACTS SUPPORTING PROBABLE CAUSE

8. On October 23, 2024, at about 2:45 a.m., Alison Kevin SANCHEZ Briones, a United States citizen, drove into the United States from Mexico through the San Ysidro Port of Entry. He was the only person in his owned car bearing California license plates.

9. A Customs and Border Protection Officer ("CBPO") was conducting pre-primary roving operations and received two negative customs declarations from SANCHEZ, who added that he was going to the Navy base. The CBPO noticed that SANCEZ was displaying signs of nervousness like not making eye contact and instead looking around. The CBPO inspected the rear cargo area of the car and found a large colored bag which contained packages wrapped in cellophane. SANCHEZ was then escorted to the security office.

10. In the car, CBPOs later found 50 packages hidden in the bag, weighing about 59.60 kilograms (131.4 pounds). A sample of the substance contained within the packages field tested positive for cocaine.

11. Defendant was placed under arrest at about 4:10 a.m.

12. During a post-*Miranda* interview, Defendant admitted that he was going to be paid $3,000 USD to smuggle the drugs into the United States. He added that he was going to receive a phone call with further instructions once in the United States. Defendant also stated that he had similarly smuggled drugs into the United States about 20 times before this arrest. And in past smuggling events, Defendant stated that he was provided a location of where to go and a person to call once he crossed the border. Defendant also stated that he had first met, and started talking to, his recruiter sometime in November 2023. (Review

of crossing records of Defendant confirmed that Defendant had multiple crossings into the United States from Mexico since, at the least, October 2023.)

13. A CBPO who performed a pat-down of Defendant in the security office found a gray iPhone in the lower front pocket of Defendant's jacket. In his post-*Miranda* interview, Defendant confirmed that the iPhone belonged to him. Defendant also provided the number attributed to the iPhone, 619-273-6088 (the number associated with the **Target Account**). He also provided his email address of k3vinsanchez@gmail.com during his interview, and review of the consent-based download showed the email address of k3vinsanchez@icloud.com, both associated with the **Target Account**.

14. Law enforcement earlier requested that Apple preserve the iCloud data associated with the **Target Account**. Apple confirmed that the data was being preserved.

15. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that the **Target Account** is being used to coordinate and facilitate the importation of controlled substances into the United States as well as the possession with intent to distribute the controlled substances within the United States. Unless disabled by a sophisticated user, iCloud accounts are automatically created and information automatically backed up. If the user of the account is using an Apple device like an iPhone (like here), device information will be automatically backed up to their iCloud account. In my training and experience, drug traffickers commonly use cellphones in furtherance of their activities because, among other reasons:

   a. Cellphones are mobile and permit instant access to phone calls, text messages, web pages, and voice messages;

   b. Cellphones permit real-time, active monitoring of controlled substances while they are in transit;

   c. Cellphones can be used to easily communicate, arrange, and synchronize the times and locations for pick up and drop off of controlled substances;

   d. Cellphones can be used to communicate using encrypted messaging

applications so as to hinder law enforcement monitoring. Given that Apple confirmed that available data for the **Target Account** was being preserved, it is likely that the subscriber or user of the **Target Account** utilizes the iCloud file hosting service to backup data from his Apple cellphone. As described in the paragraphs below, the iCloud service can be used to backup and store data from iOS devices, third-party applications, photos, videos, documents, and other electronic data.

16. Subscriber and/or user information, including: all electronic mail, files, cloud storage, location information, search history, images, text messages, voicemail, histories, buddy or friend lists, contacts, iCloud Drives, iCloud files, iCloud Backup and Restore, photos, notes, videos, calendars, messages profiles, methods of payment, detailed billing records, access logs, and transactional data will lead to the identification of co-conspirators and other evidence of drug importation and distribution. Such information is likely to be stored in the **Target Account**. I further believe that evidence of drug trafficking (such as text messages, photos, videos, locations, and contacts) may be stored in the **Target Account**. In my training and experience, narcotics traffickers may be involved in the planning and coordination of drug importation events in the days and weeks prior to such an event. Given the statements by Defendant that he had crossed drugs into the United States about 20 times before and began speaking with his recruiter in November 2023, I am requesting account data for the **Target Account** for the period between November 1, 2023, up to and including October 23, 2024, the day of his arrest.

17. Additionally, it is believed that the records are still available to Apple as a request to preserve was made under 18 U.S.C. § 2703(f).

**INFORMATION REGARDING APPLE ID AND iCLOUD**

18. Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

19. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications

("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

      a.    Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

      b.    iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

      c.    iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

      d.    iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

      e.    Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f. Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

20. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

21. An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

22. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and

password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

23. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

24. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer

service, including communications regarding a particular Apple device or service, and the repair history for a device.

25. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

26. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

27. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

28. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

29. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

30. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

31. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## PROCEDURES FOR ELECTRONICALLY-STORED INFORMATION

32. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section II of Attachment B. Upon receipt of the information described in Section II of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

33. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The ISP's personnel are not. It would be inappropriate and impractical for federal agents to search the ISP's vast computer network for the relevant accounts and then to analyze the contents of those accounts on the ISP's premises. The impact on its business would be disruptive and severe.

34. Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the subject ISP accounts, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the ISP's business activities, to protect the privacy of its subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, agents seek authorization to allow the ISP to make digital copies of the entire contents of the accounts subject to seizure. Those copies will be provided to me or to an authorized federal agent. The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

35. Analyzing the data to be provided by the ISP may require special technical skills, equipment, and software. It may also be time-consuming. Searching by keywords,

for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang or typographical errors. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Attachments to electronic mail messages are often in proprietary formats that do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. Internet Service Providers like Microsoft and Google do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

36. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination of the ISPs' records will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

37. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic communications that identify any users of the subject account and any electronic communications sent or received in temporal proximity to incriminating messages that provide context to the incriminating communications.

38. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## CONCLUSION

39. Based on the foregoing, I request that the Court issue the proposed search warrant.

40. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Davis Johnstone*
Special Agent Davis Johnstone
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 15th day of November 2024.

*David Leshner*
HON. DAVID D. LESHNER
United States Magistrate Judge